## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

| | |
|---|---|
| TREE DEFENDER, LLC | ) |
| | ) |
| Plaintiff, | ) Case No. 8:24-cv-02520-VMC-NHA |
| | ) |
| v. | ) JURY TRIAL DEMAND |
| | ) |
| MIKE HURST CITRUS SERVICE, | ) |
| INCORPORATED, | ) |
| | ) |
| Defendant. | |

### PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

Plaintiff Tree Defender, LLC ("Tree Defender"), hereby files its Opening Claim Construction Brief pursuant to Rule 15 of the United States Court of Federal Claims in support thereof Tree Defender shows the Court as follows:

### I.   THE '092 AND '965 PATENTS.

Based in Dundee, Florida, Tree Defender designs, manufactures, markets, and sells protective, breathable individual plant covers ("IPCs") that are placed on young trees for at least their first two years as they are in a vegetative and growing state. (Doc. 32, ¶¶6-7.) To protect its technology, Tree Defender sought a number of patents, including the two patents asserted in this action, U.S. Patent Nos. 11,730,092 ("the '092 Patent") and 12,058,965 ("the '965 Patent"), both titled "Plant cover with insect resistant bag for enclosing a plant." Copies of the '092 and '965 Patents are attached hereto as Exhibits 1 and 2, respectively.

As explained by the inventors, the "present disclosure relates to the field of plant cover device, and, more particularly, to insect repelling plant cover devices

and related methods." ('092 Patent, 1:16-18.[1]) The entirety of the background of the '092 and '965 Patents is dedicated to an explanation of citrus greening disease, which "is spread by a disease-infected insect, the Asian citrus psyllid, and has put the future of America's citrus at risk." ('092 Patent, 1:28-30.) As the inventors recognize, "[t]he Asian citrus psyllid is no bigger than the head of a pin yet has become the most dangerous insect pest to Florida's citrus crops." ('092 Patent, 1:33-35.) The background notes that the invention is intended for use for a lengthy period of time rather than simply short-term application: "Young trees that produce multiple flushes throughout the year are at greater risk of greening infection than mature trees because of the attraction of adult psyllids to the new flush. Even without the disease, young trees need to be protected for about four years from psyllids and leaf miners to grow optimally." ('092 Patent, 1:44-49.)

In order to accomplish the goals of the invention to resist insects—particularly the Asian citrus psyllid that transmits citrus greening disease—the inventors characterized the mesh implemented in the invention as follows:

> The panels 204, 206 may be made at least partially or completely of a mesh material, which provides water permeability and light transmissivity, but prevents intrusion by small insects such as psyllids. The mesh size may be, for example, 50 mesh or 50 by 25 threads per square inch. Such a mesh size will be sufficient to prevent intrusion by psyllids, aphids, white flies, mealy bugs, leaf miners, thrips, grasshoppers, ants, and orange dogs.

---

[1] The brief uses the citation format of column:line. The '092 and '965 Patents share an identical specification. The brief only cites to the '092 Patent, but unless indicated otherwise, the '965 Patent includes the same content.

('092 Patent, 3:50-57.) Each of the claims asserted in this include the mesh disclosed in the specification (above) of the '092 and '965 Patents.

## II.   THE LAW OF CLAIM CONSTRUCTION.

The first step in most patent infringement litigation is for the Court to define any claim terms the parties may identify. These definitions are then provided to the jury to determine if the accused device meets the claims, as defined. Some terms can readily be understood by a juror without construction at all, instead using the plain and ordinary meaning attached to the word or words. In other circumstances, claim terms take on special meaning based on the intrinsic evidence or knowledge of one of skill in the art, necessitating an express definition.

Although claim construction is a routine component of patent litigation, courts need only articulate a particular definition for terms necessary to resolve genuine and material legal disputes. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, Ltd., 521 F.3d 1351, 1361-62 (Fed. Cir. 2008); *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1219 (Fed. Cir. 2007) ("[A]ny articulated definition of a claim term ultimately must relate to the infringement questions that it is intended to answer."). In contrast, courts recognize claim construction is not "an obligatory exercise in redundancy;" it is improper to conduct claim construction where unnecessary, simply exchanging different words for straightforward language found in the issued claims. *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Instead, "the party requesting the Court to construe a claim term must demonstrate that the construction is both necessary

- 3 -

and correct; that is, construction of the claim term must be fundamental to issues of infringement or invalidity, and the Court may not issue an advisory opinion." *Omega Patents, LLC v. Calamp Corp.*, No. 6:13-cv-1950-Orl-40DAB, 2015 U.S. Dist. LEXIS 194173, at *7-8 (M.D. Fla. Feb. 20, 2015); *citing IP Cleaning S.p.A. v. Annovi Reverberi S.p.A.,* No. 08-cv-147-bbc, 2008 U.S. Dist. LEXIS 102312, at *3 (W.D. Wisc. Dec. 17, 2008).

The goal of claim construction is to provide the jury with an understanding of complex terms and/or terms that may have particular meaning in specialized fields. Much like the law of contract interpretation, the analysis generally starts with the terms chosen by the inventor and approved by the patent examiner. "The claims, of course, do not stand alone[, but] are part of a fully integrated written instrument [ ] consisting principally of a specification that concludes with the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (cleaned up). "The court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Chamberlain Grp., Inc. v. Lear Grp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008), citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). In addition to the claims and specification, a court may consider the "prosecution history" of the patent, which is the complete record of the proceedings before the

- 4 -

USPTO during the examination of the patent. *Phillips*, 415 F.3d at 1317, citing *inter alia*, *Markman*, 52 F.3d at 980; *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966). "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower that it would otherwise be." *Phillips* 415 F.3d at 317. The practice is to "exclude any interpretation that was disclaimed during prosecution." *CANVS Corp. v. U.S.,* 126 Fed. Cl. 106, 113 (Fed. Cl. 2016), citing *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed. Cir. 1988). "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g., Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

In addition to intrinsic evidence, courts have recognized extrinsic evidence "can shed useful light on the relevant art," but it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (cleaned up). As such, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005).

### III.    THE CLAIM TERMS IDENTIFIED BY THE PARTIES[2].

#### 1.    "Mesh"

> *Plaintiff's Proposed Definition: "Mesh material having a mesh size that prevents intrusion by insects detrimental to the plant while also allowing for water permeability and light transmissivity."*
>
> *Defendant's Proposed Definition: "A net-like material which provides water permeability and light transmissivity."*

There are multiple instances of the term "mesh" throughout all of the asserted claims. Tree Defender proposes a construction consistent with the specification and with the inventor's own statements describing the scope of his invention to the United States Patent and Trademark Office ("USPTO"). In sharp contrast, Hurst pursues a definition that improperly divorces the claims from the specification in hopes of converting irrelevant patents into something beneficial to its invalidity theories. Hurst's arguments should be rejected as inconsistent with the intrinsic evidence and black letter law on claim construction.

Courts recognize that when a patentee sets out a definition and acts as their own lexicographer, and/or where the patentee disavows the scope of a claim term in either the specification or during prosecution, this definition must be accepted. *Thorner v. Sony Comput. Ent. Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (where the inventor disavows claim scope, the inventor's intention is "dispositive"). "The inventors

---

[2] The parties agreed the term "mesh" should be construed by the Court. The other nine terms identified for construction were identified by Hurst, while Tree Defender does not believe they need any construction.

written description of the invention, for example is relevant and controlling insofar as it provides *clear lexicography...*" *Id.* at 1366-67, citing *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed. Cir. 2004). Moreover, where the "specification makes clear that the invention does not include a particular feature," the claim scope is disavowed. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001).

In this context, the Court look to both the file history of the asserted patents and to the file history for "related" patents, because disavowal in a different, related patent applies to other patents in the family. "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 980, 52 USPQ2d 1109, 1114 (Fed. Cir. 1999). "As long as the same claim limitation is at issue, prosecution disclaimer made on the same limitation in an ancestor application will attach." *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1333 (Fed. Cir. 2003).

One of skill in the art in this field, when considering a stated goal of the invention was *insect resistant* IPCs to be in place for years—specifically, the Asian citrus psyllid that spreads citrus greening disease ('092 Patent, 1:28-29)—understood that the mesh must be sufficiently sized to resist the intrusion of the relevant insects, while also allowing light and water to pass through the material so the plants can continue to grow. The specification makes clear that the "mesh"

- 7 -

is not to be a size large enough to allow the intrusion of insects "no bigger than the head of a pin" ('092 Patent, 1:33) that would harm young citrus trees. *See SciMed Life Sys., Inc.,* 242 F.3d at 1341 (disavowal where the "specification makes clear that the invention does not include a particular feature"). During prosecution of a related patent application (U.S. Patent Application No. 15/359,111[3]), the Examiner argued the term "mesh" should be read very broadly to be "any knit, woven or knotted fabric of open texture," and rejected the claims at issue based on a reference that disclosed using "canvas, cloth or paper." (Ex. A, Reply Brief filed on March 25, 2021, p. 3.) The inventors appealed the final rejection to the Patent Trial and Appeal Board ("PTAB"). In their Reply Brief, the inventors made clear that the term "mesh" is limited in the specification to distinguish between the claimed mesh and different material relied on by the examiner from cited references:

```
fabric of open texture".  (Id.: Emphasis added).  As correctly
quoted by the Examiner yet somehow wrongly disputed in the same
paragraph, the Specification defines a mesh as "provid[ing] water
permeability art, light transmissivity, but prevent[ing]
intrusion by small insects such as psyllids. The mesh size may
for example, 50 mesh or 50 by 25 threads per square inch.  Such a
mesh size will be sufficient to prevent intrusion by psyllids,
aphids, white flys, mealy bugs, leaf miners, thrips,
grasshoppers, ants, and orange dogs."  (Paragraph 31).
```

---

[3] Both the '092 and '965 Patents are in the continuation chain of U.S. Patent Application No. 15/359,111, which has the identical specification, as reflected by the "Related U.S. Application Data" sections of each patent.

(Ex. 3, p. 3.) The inventors' express statement to the PTAB acts as a clear disavowal specific to the term "mesh," confirming that to achieve the purpose of the invention, "mesh" must allow for water permeability and light transmissivity while being sized to prevent psyllids. On May 25, 2021, the PTAB rejected the Examiner's definition and reversed the Examiner's decision on patentability, expressly relying in part on the inventors' definition of the term mesh. (Ex. 4.) The claims from Application 15/359,111 subsequently issued in U.S. Patent No. 11,122,752. As the Federal Circuit has recognized, such a disavowal is "dispositive" of the definition of "mesh." *Phillips*, 415 F.3d at 1316.

Just like the original Examiner that wrongly construed the term mesh based on Dictionary.com definitions, Hurst jettisons the definition of mesh used by the inventor and the PTAB, instead turning to dictionaries to contend the "mesh" is "net-like" in a transparent effort to rely on references (for invalidity theories) that fail to disclose mesh as claimed in the '092 and '965 Patents. Hurst's dictionary-based definition ignores the clear disavowal and would render the invention—directed to psyllid-repellant IPCs—inoperable. *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002) (citation omitted), vacated and remanded on other grounds, 537 U.S. 802, 123 S. Ct. 70, 154 L. Ed. 2d 3 (2002) ("a construction that renders the claimed invention inoperable should be viewed with extreme skepticism.") More importantly, no matter what Hurst can cite to from a dictionary, this extrinsic evidence cannot override the intrinsic evidence and the express disavowal of claim scope. The Federal Circuit's guidance on this issue is

unequivocal—the definition the inventors relied on for the same term during prosecution of a related patent is the only proper definition. *Id.*; *c.f. Speedtrack, Inc. v. Amazon*, 998 F.3d 1373, 1377 (Fed. Cir. 2021); ("A patentee may, through a clear and unmistakable disavowal in the prosecution history, surrender certain claim scope to which he would otherwise have an exclusive right by virtue of the claim language.") Tree Defender's definition should be adopted.

### 2.    "Major mesh surface"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "The principal area of each panel formed of mesh material. Alternatively, this claim term is indefinite."* |

The "major mesh surface" is the first of nine terms identified for construction were identified only by Hurst, while at the same time refusing to articulate how any of the nine terms were relevant for either analyzing infringement or invalidity. Nonetheless, Tree Defender will address each term in sequence. The first is "major mesh surface," which is straightforward once the Court establishes the definition of the term "mesh" embedded therein. Once the jury is instructed on the definition of "mesh," they can easily interpret this term using the plain and order meaning of the other words int eh context of the claim language itself. The relevant claim language is from claim 1 of the '092 Patent:

> an enclosure comprising a plurality of panels coupled together to define a plant-receiving cavity therein, each of the plurality of panels comprising
>
> a major mesh surface, and

- 10 -

> a seam extending along a peripheral edge of the major mesh surface, adjacent panels being coupled together at respective seams,

The claim language is straightforward--each panel of the claimed IPC has a "major mesh surface" with a seam around the peripheral edge. No further construction is needed. Yet Hurst argues the term should be defined as "*The principal area of each panel formed of mesh material.*" The specification never uses the phrase "principal area;" instead, Hurst turns to extrinsic evidence, which can sometimes "shed useful light on the relevant art," but is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d at 1317. How does exchanging the inventor's language, "major mesh surface," for "principal area of each panel formed of mesh material" assist the jury? Is the "principal area" more or less than the major mesh surface? If there is a meaningful difference, it is not apparent, and without any difference how does substituting language from Hurst with the original claim language impact either infringement or invalidity? There does not appear to be any difference, yet this Court requires the terms to be "likely to be most significant to resolving the parties' dispute." (Doc. 22, p. 1.) *See also Omega Patents*, 2015 U.S. Dist. LEXIS 194173, at *7-8 ("...construction of the claim term must be fundamental to issues of infringement or invalidity, and the Court may not issue an advisory opinion.").

As an "alternative," Hurst argues the term is indefinite. For virtually every term identified by Hurst, it argues either its definition is correct, or the term must

be indefinite, because if Hurst cannot define the term, apparently no one can. Such contentions are without merit. "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). To be sufficiently definite, "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id*. A party claiming indefiniteness has "the burden of proving indefiniteness by clear and convincing evidence." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Nothing offered by Hurst precludes one from understanding the inventors' language in the context of the claims—certainly not with a burden of clear and convincing evidence. Hurst's definition should be rejected.

### 3.    "Seam/seams"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "Line(s) created by connecting edges of panels forming and providing rigidity for an exterior perimeter of the plant cover."* |

As seems to be endemic of all defendants in patent infringement cases, Hurst offers a definition for a term that would be well understood by any member of the jury by pulling in limitations from the specification. Indeed, even the specification describes a "seam" exactly as people commonly understand the term: a

"conventional joining mechanism such as using an adhesive, sewing, stapling, or the like." ('092 Patent, 3:16-18.)

There is a "heavy presumption" that the terms used in claims "mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364 (Fed. Cir. 2003), citing *Tex. Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1201 (Fed. Cir. 2002). Sometimes "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314, citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001). While the specification is "always highly relevant to the claim construction analysis" (*Phillips*, 415 F.3d at 1315), "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Teleflex, Inc. v. Ficosa N.Am.Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002), citing *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). Put more succinctly, it is improper to "import[ ] limitations from the specification into the claims." *Phillips*, 415 F.3d at 1323; *Vivint, Inc. v. ADT LLC*, No. 2023-1995, 2024 U.S. App. LEXIS 31392, at *3 (Fed. Cir. Dec. 11, 2024); *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 561 (Fed. Cir. 2020).

Yet this is exactly what Hurst proposes in this instance. Although the inventors confirm the seam is used in its ordinary way, Hurst urges this Court to pull in other portions of the specification referring to a maintaining a "kite shape," which relates to different embodiments that have been separately claimed in, for example, U.S. Patent No. 11,122,752. In sharp contrast, the claims at issue in this case do not include limitations on shape, whether "kite shaped" or other alternatives. Indeed, the inventors expressly noted that the specification describes "example aspects and embodiments," but also emphasized that "[t]he plant cover may be embodied in many different forms and should not be construed as limited to only the embodiments described here." ('092 Patent, 2:50-59.) There is nothing in the specification to support importing the limitations proposed by Hurst to <u>all</u> embodiments. Hurst's proposed definition should be rejected in favor of the plan and ordinary meaning.

### 4. "First mesh section"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "The upper mesh portion of the enclosure that terminates in the closed top end. Alternatively, this claim term is indefinite."* |

On this claim term, Hurst is redundantly drawing other claim language into the term "first mesh section," creating confusion rather than providing clarity. For example, in claim 1 of the '092 patent, the relevant claim limitation is "a <u>first mesh</u> <u>section</u>, respective seams and adjacent mesh surfaces of the first mesh section

terminating at a sealed top end…" The claim language itself defines the orientation of the first mesh section with other elements of the claim, including stating it terminates in a sealed top end. Hurst's definition would result in the claim element reading: "*The upper mesh portion of the enclosure that terminates in the closed top end,* respective seams and adjacent mesh surfaces of the first mesh section terminating at a sealed top end…" This is the epitome of claim construction redundancy, which is improper.

Hurst also includes what it believes must be the obligatory indefinite argument, but there is nothing remotely unclear about this term. Without clear and convincing evidence to the contrary, Hurst's definition should be rejected in favor of the plain and ordinary meaning.

### 5. "Sealed"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "Closed off at the top end of the enclosure. Alternatively, this claim term is indefinite."* |

With regard to "sealed," Hurst seems to offer different language and more redundant claim language. Again turning to claim 1 of the '092 patent, relevant claim limitation includes "a first mesh section, respective seams and adjacent mesh surfaces of the first mesh section terminating at a <u>sealed</u> top end…" First, the inventors used the term "closed" multiple times (but never "closed off"), but never in the context of the top end of the mesh sections. Like with other proposed definitions, this one again pulls language from elsewhere in the same claim,

creating redundancy and confusion. Finally, it is unclear how such a change has any impact on infringement or validity. The jury will not have any problem with understanding the term sealed—it is in no way indefinite. Hurst's definition should be rejected in favor of plain and ordinary meaning.

### 6. "Second mesh section"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "The lower mesh portion of the enclosure attached to the first mesh section at its upper boundary. Alternatively, this claim term is indefinite."* |

As it did with the first mesh section, Hurst offers slightly different language while dragging in redundant claim language from the same claim element. Turning again to claim 1 of the '092 Patent, the relevant language is "a <u>second mesh section</u> integral with the first mesh section, the <u>second mesh section</u> defining a bottom end opposite the sealed top end…" If implemented, Hurst's proposed construction (for just this element) results in the same claim language reading "a <u>The lower mesh portion of the enclosure attached to the first mesh section at its upper boundary</u> integral with the first mesh section, the <u>lower mesh portion of the enclosure attached to the first mesh section at its upper boundary</u> defining a bottom end opposite the sealed top end…" Hurst's proposed construction butchers the claim, rendering it redundant and nonsensical. The claim language itself clearly defines the structure and how it relates to other claim elements. There is no basis to

- 16 -

contend such language is indefinite. Hurst's definition should be rejected in favor of plain and ordinary meaning.

### 7. "Integral"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "Joined or combined with another part so as to form a unified, continuous structure. Alternatively, this claim term is indefinite."* |

With the term integral, Hurst seeks to replace a commonly known word with a phrase characterizing the term to require a "unified, continuous" structure. Neither the term unified nor continuous is found in the specification. Instead, Hurst (again) turns to a dictionary to swap in different words for those known and understood to a jury. Claim 1 of the '092 Patent is one instance of the term "integral," and states in relevant part:

the plurality of panels defining

a first mesh section, respective seams and adjacent mesh surfaces of the first mesh section terminating at a sealed top end,

a second mesh section <u>integral</u> with the first mesh section, the second mesh section defining a bottom end opposite the sealed top end, and

a trunk receiving opening at the bottom end...

There is nothing confusing or indefinite about this phrase. The first and second mesh sections integrate as components of the plurality of panels. What does it mean that these sections are a "unified, continuous structure"? The claim itself explains that the first and second mesh sections, along with the trunk receiving

- 17 -

opening, define the plurality of panels. Hurst's definition deems the two mesh sections as a "unified, continuous structure" to the exclusion of the trunk receiving opening, seemingly in contradiction of the claim language itself. Ultimately, there is nothing confusing or indefinite about the language, which identified each structure and the relationship of each structure to other claimed structures. There is no basis to contend such language is indefinite. Hurst's definition should be rejected in favor of plain and ordinary meaning.

### 8.   "Opposite"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |
| *Defendant's Proposed Definition: "On the other side or far end relative to the closed top end. Alternatively, this claim term is indefinite."* |

With the term "opposite," Hurst takes the concept of claim construction to the absurd. Relevant language from the claim 1 of the '092 Patent: "a second mesh section integral with the first mesh section, the second mesh section defining a bottom end opposite the sealed top end…" How could redefining the term opposite with additional words clarify anything or be relevant to infringement or validity? The jury knows what opposite means—this is not a difficult or technical concept, nor a basis for indefiniteness. Hurst's definition should be rejected in favor of plain and ordinary meaning.

### 9.   "First perimeter"

| |
|---|
| *Plaintiff's Proposed Definition: Plain and ordinary meaning.* |

*Defendant's Proposed Definition: "The circumferential edge at the lower end of the first mesh section, opposite the closed top end. Alternatively, this claim term is indefinite."*

Hurst next contends the "first perimeter" needs definition, despite using a term jurors will be familiar with, especially in light of the claim language. Relevant language from claim 1 of the '965 Patent is as follows:

a first mesh section having

a closed top end, and

a <u>first perimeter</u> opposite the closed top end…

Somehow from this straightforward language, Hurst interjects the limitation of a "circumferential edge" of the first mesh section, as though Hurst's language—which is not in the specification—is better than the language of the inventors that was agreed upon with the USPTO. Again, this is an example of seeking claim construction for the sake of construction, not to provide any needed clarity. The jury is capable of understanding the language as it. There is no basis for indefiniteness or exchanging different words for those used int the claims. Hurst's definition should be rejected in favor of plain and ordinary meaning.

### 10.   <u>"Second perimeter"</u>

*Plaintiff's Proposed Definition: Plain and ordinary meaning.*

*Defendant's Proposed Definition: "The circumferential edge at the upper end of the second mesh section, which attaches to the first perimeter of the first mesh section, joining the two sections. Alternatively, this claim term is indefinite."*

As it argued with the "first perimeter," Hurst contends the "second perimeter" is also in need of definition and again proposes swapping in "circumferential edge" for existing language. Not only that, but Hurst's definition of the "second perimeter" nests reference to the "first perimeter" therein, presumably meaning Hurst would propose its definition for the "first perimeter" being interjected into this definition. Relevant language from claim 1 of the '965 Patent is as follows:

a second mesh section having

> a second perimeter being integral with the first perimeter of the first mesh section, the first perimeter and the second perimeter partially defining the plant-receiving cavity, and

> a bottom end opposite the closed top end of the first mesh section defining a trunk receiving opening; and...

If the goal of construction is to hopefully confuse the jury with a word salad instead of focusing on the actual language, perhaps Hurst's approach would be proper. Indeed, if the Court were to adopt just the definitions of first and second perimeter from Hurst, the jury would be hopelessly lost analyzing infringement and invalidity of these claim elements shown side-by-side:

| Original Language | Hurst Language (with definitions for first and second perimeter incorporated) |
|---|---|
| a first mesh section having | a first mesh section having |
| a closed top end, and | a closed top end, and |
| a first perimeter opposite the closed top end, and | a *circumferential edge at the upper end of the second mesh section, which* |

| | |
|---|---|
| a second mesh section having<br><br>a second perimeter being integral with the first perimeter of the first mesh section, the first perimeter and the second perimeter partially defining the plant-receiving cavity, and<br><br>a bottom end opposite the closed top end of the first mesh section defining a trunk receiving opening; and | *attaches to the [circumferential edge at the lower end of the first mesh section, opposite the closed top end] of the first mesh section, joining the two sections opposite the closed top end*, and<br><br>a second mesh section having<br><br>a *circumferential edge at the upper end of the second mesh section, which attaches to the [The circumferential edge at the lower end of the first mesh section, opposite the closed top end] of the first mesh section, joining the two sections* being integral with the *circumferential edge at the lower end of the first mesh section, opposite the closed top end* of the first mesh section, the *circumferential edge at the lower end of the first mesh section, opposite the closed top end* and the *circumferential edge at the upper end of the second mesh section, which attaches to the [circumferential edge at the lower end of the first mesh section, opposite the closed top end] of the first mesh section, joining the two sections* partially defining the plant-receiving cavity<br><br>a bottom end opposite the closed top end of the first mesh section defining a trunk receiving opening; and... |

Claim construction is not an exercise in redundancy or for interjecting confusion and improper limitations. There is no basis for indefiniteness or exchanging different words for those used int the claims. Hurst's definition should be rejected in favor of plain and ordinary meaning.

## IV.   CONCLUSION

Predictable for a defendant in patent litigation seeking to manipulate claim language in a bid to avoid liability, Hurst lobbies for claim interpretations that divorce the teaching of the specification and the claim language itself for language intended to create redundancy and confusion. The Court should reject Hurst's efforts to improperly construe the terms to manufacture defenses rather than focus on the intrinsic evidence and claim construction law, and instead construe the terms as follows:

| Claim Term | Plaintiff's Proposed Definition |
|---|---|
| 1. Mesh | Mesh material having a mesh size that prevents intrusion by insects detrimental to the plant while also allowing for water permeability and light transmissivity |
| 2. Major mesh surface | Plain and ordinary meaning |
| 3. Seam/seams | Plain and ordinary meaning |
| 4. First mesh section | Plain and ordinary meaning |
| 5. Sealed | Plain and ordinary meaning |
| 6. Second mesh section | Plain and ordinary meaning |
| 7. Integral | Plain and ordinary meaning |
| 8. Opposite | Plain and ordinary meaning |
| 9. First perimeter | Plain and ordinary meaning |
| 10. Second perimeter | Plain and ordinary meaning |

Respectfully submitted, August 15, 2025.

By:/s/ *Ryan T. Santurri*
Ryan T. Santurri (pro hac vice)
Florida Bar No. 15698
Email: rsanturri@allendyer.com
Allen, Dyer, Doppelt + Gilchrist, P.A.
255 South Orange Avenue, Suite 1401
Post Office Box 3791
Orlando, Florida 32801
(407) 841-2330

Attorneys for Plaintiff

CERTIFICATE OF COMPLIANCE

Pursuant to LR 1.08(a), MD Fla, the undersigned counsel certifies that the foregoing has been prepared in Century Schoolbook 13 point, one of the fonts and points approved by the Court in LR 1.08(a).

*/s/ Ryan T. Santurri*
Ryan T. Santurri
Florida Bar No. 15698
Email: rsanturri@allendyer.com

- 23 -

- 24 -

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 15, 2025, I electronically filed the foregoing using the Case Management/Electronic Case Filing ("CM/ECF") system, which will send a Notice of Electronic Filing to the following CM/ECF participants:

*Richard Fee, Esq.*
*Kathleen M. Wade, Esq.*
*1227 N. Franklin Street*
*Tampa, FL 33602*
*rfee@feejeffries.com*
*kwade@feejeffries.com*

/s/ *Ryan T. Santurri*
Ryan T. Santurri
Florida Bar No. 15698
Email: rsanturri@allendyer.com