UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TREE DEFENDER, LLC,

      Plaintiff,

v.                              Case No. 8:24-cv-2520-VMC-NHA

MIKE HURST CITRUS SERVICE, INC.,

      Defendant.

_____/

**ORDER**

This matter comes before the Court for patent claims construction. Plaintiff Tree Defender, LLC submitted its Opening Claim Construction Brief on August 15, 2025. (Doc. # 46). Defendant Mike Hurst Citrus Service, Inc. ("Hurst Citrus") filed its Claim Construction Opposition Brief on September 2, 2025. (Doc. # 47). Tree Defender replied on September 10, 2025. (Doc. # 48). On October 24, 2025, a claims construction hearing was held in which both Tree Defender and Hurst Citrus made arguments to the Court. (Doc. # 49). For the reasons stated below, the claims are construed as set forth herein.

1

## I.   <u>Background</u>

Tree Defender "designs, manufactures, markets, and sells protective, breathable individual plant covers ('IPCs') that are placed on young trees for at least their first two years as they are in a vegetative and growing state." (Doc. # 32 at 3). According to Tree Defender, the IPCs were developed in response to a disease commonly referred to as citrus greening disease, which can devastate citrus crops. (<u>Id.</u> at 4).

Hurst Citrus also produces IPCs and is a direct competitor of Tree Defender in the IPC market. (Doc. # 36 at 3-4). Tree Defender alleges that the IPCs sold by Hurst Citrus infringe upon Tree Defender's patented IPC technology. (Doc. # 32 at 7-14).

There are two patents at issue in this action, each possessed by Tree Defender in relation to its IPC: U.S. Patent Nos. 11,730,092 ("the '092 Patent") and 12,058,965 ("the '965 Patent"), both titled "Plant cover with insect resistant bag for enclosing a plant." (Doc. ## 46-1, 46-2). The '092 and '965 Patents were issued on August 22, 2023, and August 13, 2024, respectively. (<u>Id.</u>). Here, there is only one remaining disputed claim term: "mesh." <u>See</u> (Doc. # 47 at 6) (indicating the sole remaining disputed claim term is "mesh"); (Doc. # 48 at 1) (same).

## II.   **Legal Standards**

Patent infringement cases involve two distinct phases: (1) "the proper construction of the asserted claim," and (2) "a determination as to whether the accused method or product infringes the asserted claim as properly construed." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996) (citation omitted).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Id. at 1582 (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996)). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Id.

"First, [a court considers] the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Id. (citation omitted). "Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the

3

term is clearly stated in the patent specification or file history." Id. (citation omitted). Moreover, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . .." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (citations omitted). "[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314.

"[S]econd, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitronics Corp., 90 F.3d at 1582. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Id. (citation omitted). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Phillips, 415 F.3d at 1316. The specification usually "is dispositive; it is the

4

single best guide to the meaning of a disputed term." Vitronics Corp., 90 F.3d at 1582.

Third, "a court 'should also consider the patent's prosecution history, if it is in evidence.'" Phillips, 415 F.3d at 1317 (citations omitted). "This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." Vitronics Corp., 90 F.3d at 1582. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317 (citing Vitronics Corp., 90 F.3d at 1582-83). "The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation and quotation marks omitted).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." Vitronics Corp., 90 F.3d at 1583. "In such circumstances, it is improper to rely on extrinsic evidence."

5

Id. (citations omitted). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317 (citing Markman, 52 F.3d at 980).

### III. **Analysis**

| Tree Defender's Proposed Construction | Hurst Citrus's Proposed Construction | Court's Construction |
|---|---|---|
| Mesh material having a mesh size that prevents intrusion by insects detrimental to the plant while also allowing for water permeability and light transmissivity. | A net-like material which provides water permeability and light transmissivity. | A net-like material having a mesh size which provides water permeability and light transmissivity, but prevents intrusion by small insects such as psyllids. |

Again, this case concerns one disputed term: "mesh." See (Doc. # 47 at 6) (indicating the sole remaining disputed claim term is "mesh"); (Doc. # 48 at 1) (same). The term "mesh" appears throughout the claims in both the '092 and '965 Patents. See (Doc. # 46-1 at 16; 46-2 at 16-17).

As shown above, the parties both agree that the construction of "mesh" in the '092 and '965 Patents must refer to a material that provides "water permeability and light

transmissivity." See (Doc ## 46 at 6; 47 at 6-7). Accordingly, the sole dispute for the Court to decide is whether the claim term "mesh" must refer to a material that also prevents intrusion by insects. Tree Defender seeks a construction of "mesh" that requires preventing intrusion by insects, whereas Hurst Citrus seeks a construction of "mesh" without reference to preventing intrusion by insects. (Id.).

Tree Defender contends that its proposed construction is "consistent with the specification and with the inventor's own statements describing the scope of his invention to the United States Patent and Trademark Office ('USPTO')." (Doc. # 46 at 6). In opposition, Hurst Citrus contends that its proposed construction is "easily understood, consistent with the intrinsic evidence, and follows claim construction principles," and that Tree Defender's construction "asks this Court to violate fundamental claim construction principles." (Doc. # 47 at 6-7).

A. **The Claims' Language**

The starting point for claims construction is "the words of the claims themselves." Vitronics, 90 F.3d at 1582. Here, neither Tree Defender nor Hurst Citrus argue that the words of the claims in the '092 and '965 Patents provide a construction of the term "mesh." See generally (Doc. ## 46,

7

47, 48). Nor could they, because none of the claims in the '092 and '965 Patents provide any definition of "mesh." <u>See</u> (Doc. ## 46-1 at 16; 46-2 at 16-17). None of the claims in the '092 and '965 Patents reference water permeability or light transmissivity. (<u>Id.</u>). Indeed, none of the claims make any reference to insects generally, insects specifically responsible for citrus greening disease, or prevention of insect intrusion. (<u>Id.</u>).

Because the words of the claims in the '092 and '965 Patents do not define the term "mesh," the term is to be given it ordinary meaning as understood by the person of ordinary skill in the art. <u>Phillips</u>, 415 F.3d at 1313. Here, the person of ordinary skill in the art would be a citrus farmer using IPCs to protect plants. "Importantly, the person of ordinary skill in the art is deemed to read the claim term . . . in the context of the entire patent, including the specification." <u>Id.</u>

B. **<u>The Specification</u>**

The Court now turns to the '092 and '965 Patents' specifications to determine how a person of ordinary skill in the art would understand the claim term "mesh."

First, the '092 and '965 Patents' titles (which are identical) explicitly reference preventing the intrusion by

8

insects. See (Doc. # 46-1) ("PLANT COVER WITH *INSECT RESISTANT BAG FOR ENCLOSING A PLANT*") (emphasis added); (Doc. # 46-2) (same). Second, the '092 and '965 Patents' "technical field" descriptions (which are identical) also explicitly reference preventing the intrusion by insects. See (Doc. # 46-1 at 14) ("The present disclosure relates to the field of plant cover device, and, more particularly, to *insect repelling* plant cover devices and related methods.") (emphasis added); (Doc. # 46-2 at 14) (same).

Third, the '092 and '965 Patents' "background" descriptions (which are also identical) explicitly discuss how citrus greening disease is spread by an insect, the Asian citrus psyllid. (Doc. ## 46-1 at 14, 46-2 at 14). The "background" descriptions discuss how the Asian citrus psyllid is "no bigger than the head of a pin." (Id.). They further discuss that citrus greening disease has typically been managed with insecticides, which may be environmentally harmful. (Id.). In addition, they discuss that citrus greening disease is sometimes managed by use of "tree covers that enclose a tree *to prevent insect infiltration*," but that conventional tree covers suffer from drawbacks. (Id.) (emphasis added).

The Court finds that titles, "technical field" descriptions, and "background" descriptions in the '092 and '965 Patents all support that the specifications define the claim term "mesh" by implication. See Vitronics Corp., 90 F.3d at 1582 ("The specification acts as a dictionary . . . when it defines terms by implication."). Specifically, the aforementioned parts of the specifications impliedly define "mesh" to include preventing intrusion by insects.

The specifications do not end there. The specifications' "detailed description" sections also expressly reference preventing intrusion by insects. (Doc. ## 46-1 at 14-15, 46-2 at 15-16). Specifically, the "detailed description" sections both include the following:

> The panels 204, 206 may be made at least partially or completely of *a mesh material, which provides water permeability and light transmissivity, but prevents intrusion by small insects such as psyllids.* The mesh size may be, for example, 50 mesh or 50 by 25 threads per square inch. Such a *mesh size will be sufficient to prevent intrusion by psyllids, aphids, white flies, mealy bugs, leaf miners, thrips, grasshoppers, ants, and orange dogs.* The bag 200 may also protect the enclosed foliage from frost, hail, and wind damage.

(Doc. ## 46-1 at 15, 46-2 at 15) (emphasis added). Indeed, the above description purports to expressly define the term "mesh" as a material "which provides water permeability and light transmissivity, but prevents intrusion by small insects

10

such as psyllids." However, the specifications also each contain the following disclaimer at the beginning of the "detailed description" sections:

> This disclosure describes example aspects and embodiments, but not all possible aspects and embodiments of the plant cover and related methods. Where a particular feature is disclosed in the context of a particular aspect or embodiment, that feature can also be used, to the extent possible, in combination with and/or in the context of other aspects and embodiments. The plant cover may be embodied in many different forms and *should not be construed as limited to only the embodiments described here.*

(Doc. ## 46-1 at 14, 46-2 at 15) (emphasis added).

Furthermore, the specifications also each contain the following additional disclaimer at the end of the "detailed description" sections:

> *The scope of the claims is not limited to the only the examples described here.* The plant cover system and its components may be embodied in many different forms.

(Doc. ## 46-1 at 15, 46-2 at 16) (emphasis added).

As discussed below, the Court finds that these explicit disclaimers negate the purported express definition of "mesh" in the "detailed description" sections of the specifications. However, the Court finds that these explicit disclaimers do not negate the implied definition of "mesh" in the title,

11

"technical field," and "background" description sections of the specifications.

"The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Vitronics Corp., 90 F.3d at 1582. "[C]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." SunRace Roots Enter. Co., Ltd. v. SRAM Corp., 336 F.3d 1298, 1304 (Fed. Cir. 2003) (citing Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

While the Court "must interpret the claims in light of the specification," it must "avoid impermissibly importing limitations from the specification." Alloc, Inc. v. Int'l Trade Com'n, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (citations omitted). "That balance turns on how the specification characterizes the claimed invention." Id. (citation omitted). Accordingly, the Court must look "to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification

12

read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." Id.

Here, the "detailed description" sections of the '092 and '965 Patents' specifications do not use "words or expressions of manifest exclusion or restriction." SunRace, 336 F.3d at 1304. Indeed, the "detailed description" sections include exactly the opposite: a disclaimer that explicitly states that the '092 and '965 Patents' claims "should not be construed as limited to only the embodiments described here" and are "not limited to the only the examples described here." (Doc. ## 46-1 at 14-15, 46-2 at 15-16). Accordingly, the "detailed description" sections' description of the claim term "mesh" as "a mesh material, which provides water permeability and light transmissivity, but prevents intrusion by small insects such as psyllids," is a "part of less than all possible embodiments." See Alloc, Inc., 342 F.3d at 1370.

Nevertheless, the title, "technical description," and "background" description sections of the specifications all impliedly define "mesh" to include preventing the intrusion by insects. Indeed, the specifications characterize the claimed invention as "insect repelling." Though the disclaimers in the "detailed description" sections' negate

13

the "example aspects and embodiments" described in those sections, the specification read as a whole leads to the conclusion that the claimed inventions must prevent intrusion by insects. Accordingly, the '092 and '965 Patents' specifications, read as a whole, impliedly narrow the ordinary definition of the term "mesh," such that the term must be read as a material that prevents intrusion by insects.

## C. **The Prosecution History**

Finally, the Court turns to the prosecution history of the '092 and '965 Patents. The Court notes that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317 (citations omitted). "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. (citations omitted). "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction

14

is to 'capture the scope of the actual invention' that is disclosed, described, and patented." Iridescent Networks, Inc. v. AT&T Mobility, LLC, 933 F.3d 1345, 1352-53 (Fed. Cir. 2019). "Disclaimers based on disavowing actions or statements during prosecution, however, must be both clear and unmistakable." Sorensen v. Int'l Trade Comm'n, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005).

### i.    Related Patent Applications

"When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999). "As long as the same claim limitation is at issue, prosecution disclaimer made on the same limitation in an ancestor application will attach." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1333 (Fed. Cir. 2003).

Here, Tree Defender has submitted exhibits of the prosecution history of a related patent application for U.S. Patent Application No. 15/359,111 ("the '111 Application"). (Doc. ## 46-3, 46-4). Tree Defender represents, and Hurst Citrus does not dispute, that "[b]oth the '092 and '965

15

Patents are in the continuation chain of U.S. Patent Application No. 15/359,111, which has the identical specification." (Doc. ## 46 at 8, n.3); see generally (Doc. # 47 at 12-14). Indeed, the '092 and '965 Patents explicitly disclose the '111 Application as a "related application." (Doc. ## 46-1 at 1, 46-2 at 1).

However, neither party discusses whether a patent for the '111 Application was actually issued. The Court notes that Elkay permits consideration of related application prosecution history of "any *patent that has issued*." Elkay Mfg. Co., 192 F.3d at 980 (emphasis added). However, Omega permits consideration of prosecution history of patent applications, but does not make reference to whether a patent needs to be issued. See Omega Eng'g, Inc., 334 F.3d at 1333 ("Our precedent holds . . . that an interpretation asserted in the prosecution of a parent application can also affect continuation applications . . . continuation-in-part applications . . . and even related continuation-in-part applications arising from the same parent . . .." (citing Id.) (other citations omitted)).

Moreover, Hurst Citrus does not argue that if no patent was issued for the '111 Application then this Court is not permitted to consider the prosecution history of the '111

16

Application. See generally (Doc. # 47 at 12-14). Instead, Hurst Citrus argues that (1) the prosecution history of the '111 Application provides no evidence of a clear disclaimer that would support Tree Defender's construction of "mesh," and (2) "even if considered," the '111 Application's "prosecution history does not support [Tree Defender's] proposed construction." (Doc. # 47 at 12). While the use of the phrase "even if considered" might imply that Hurst Citrus's first argument rejects consideration of the '111 Application's prosecution history, the Court finds that both of Hurst Citrus's arguments actually do consider the prosecution history, but nonetheless reject it as not supporting Tree Defender's construction.

Accordingly, the Court will consider the prosecution history of the '111 Application to determine whether and how it bears on the construction of the claim term "mesh" in the '092 and '965 Patents.

### ii.  **Prosecution History of the '111 Application**

During the prosecution of the '111 Application, the USPTO examiner interpreted the claim term "mesh" as "(1) any knit, woven or knotted fabric of open texture and (2) an interwoven or intertwined structure." (Doc. ## 46-3 at 3-4; 46-4 at 5). In its opposition brief (referred to as a "Reply")

17

during the patent prosecution before the USPTO, the '111 Application's applicant ("Applicant") explicitly argued that:

> the Specification defines a mesh as provid[ing] water permeability art, light transmissivity, but prevent[ing] intrusion by small insects such as psyllids.

(Doc. # 46-3 at 4) (internal quotation marks omitted) (alterations in original).

The examiner disagreed with the Applicant's argument and concluded that a prior art pertaining to cloth had already disclosed the '111 Application's claim, reasoning that "cloth is understood as a material comprising an interlaced structure i.e., mesh." (Doc. # 46-4 at 5). Accordingly, the USPTO examiner rejected the '111 Application's claims as unpatentable. (Id.).

The Applicant appealed the examiner's decision to the UTPTO's Patent Trial and Appeal Board ("PTAB"). (Id. at 1). The PTAB agreed with the Applicant's argument that "not all cloth is water permeable, and has light transmissivity," and found that the prior art in question "does not appear to have such properties or characteristics." (Id. at 6-7). Accordingly, the PTAB reversed the examiner's decision of unpatentability. (Id. at 8).

18

The Court finds that the PTAB's decision itself does not support a construction of the claim term "mesh" to include preventing intrusion by insects. The PTAB decision makes no reference to insects at all. Instead, it merely found that the prior art pertaining to cloth did not negate the patentability of the mesh at issue because not all cloth is water permeable and light transmissive. In effect, the PTAB found that "mesh" must provide water permeability and light transmissivity, but was silent as to whether it must prevent insect intrusion.

That said, the Reply filed by the Applicant provides explicit support for a construction of the claim term "mesh" to include preventing intrusion by insects. In the Reply, the Applicant explicitly took the position that the specification "defines a mesh as 'provid[ing] water permeability art, light transmissivity, but *prevent[ing] intrusion by small insects such as psyllids*.'" (Doc. # 46-3 at 4) (emphasis added) (alterations in original).

Hurst Citrus unpersuasively urges that "[m]ere argument by [Tree Defender's] attorney in a Reply Brief to the [PTAB] does not effect a clear disavowal." (Doc. # 47 at 13). To the contrary, "explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over

19

prior art may serve to narrow the scope of a claim." Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998). "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Omega Eng'g, Inc., 334 F.3d at 1324. Here, the Reply brief filed by the Applicant "unequivocally imparted" a meaning of "mesh" that includes preventing intrusion by insects, and thereby "expressly relinquished" any construction of "mesh" that does not refer to preventing insects. See Id. at 1323-24.

The Reply's narrowed definition of "mesh" is not ambiguous. See Id. at 1324 (discussing that the doctrine of prosecution disclaimer does not apply where the alleged disavowal of claim scope is ambiguous). The definition of "mesh" provided by the Applicant in the Reply unambiguously requires that "mesh" prevent intrusion by small insects such as psyllids. This definition is not "amenable to multiple reasonable interpretations," Id., as nothing in the Reply indicates that "mesh" could allow insects to intrude. The Reply "'clearly set forth a definition of the disputed claim term' [mesh] other than its plain and ordinary meaning." CCS

20

Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Accordingly, the prosecution history of the '111 Application shows that the Applicant expressly narrowed the ordinary definition of the term "mesh," such that the term must be read as a material that prevents intrusion by insects. That narrowed definition attaches to the '092 and '965 Patents. See Omega Eng'g, Inc., 334 F.3d at 1333.

### D. Hurst Citrus's Other Arguments Fail

The Court now addresses the few remaining arguments raised by Hurst Citrus for its proposition that Tree Defender's construction is improper.

Hurst Citrus contends that Tree Defender's construction "adds an unexamined claim limitation." (Doc. # 47 at 14-15). This argument fails because the narrowed definition of "mesh" was explicitly provided in the prosecution history of the '111 Application before the USPTO. Under the doctrine of prosecution disclaimer, that narrowed definition attaches to the '092 and '965 Patents. See Omega Eng'g, Inc., 334 F.3d at 1333.

Hurst Citrus next contends that Tree Defender's construction improperly claims "results" rather than an apparatus. (Doc. # 47 at 15). According to Hurst Citrus,

21

"[Tree Defender's] construction essentially asks to convert a general term ('mesh') into a means-plus-function style limitation ('means for preventing insect intrusion') without invoking 35 U.S.C. § 112(f) or using any such claim language." (Id.). In reply, Tree Defender argues that its proposed construction "is solely a limitation on the properties or characteristics of mesh claimed, and specifying size limitations for the mesh does not render the term either functional or results based." (Doc. # 48 at 6).

"A means-plus-function limitation recites a function to be performed rather than definite structure or materials for performing that function." Lockheed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308, 1318 (Fed. Cir. 2003).

> The overall means-plus-function analysis is a two-step process. The first step is to determine whether a claim limitation is drafted in means-plus-function format, which requires [the Court] to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art. If the limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format, and § 112[(f)] does not apply. If, . . . the limitation is in means-plus-function format, [the Court performs] the second step of determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'

Dyfan, LLC v. Target Corp., 28 F.4th 1360, 1365 (Fed. Cir. 2022) (citations omitted). If the claim term does not use the

22

term "means," there is a rebuttable presumption that the claim limitation is not drafted in means-plus-function format. Id. (citations omitted). "The presumption can be overcome if a challenger demonstrates that the claim term 'fails to recite sufficiently definite structure.'" Id. (citations omitted); see also Id. at 1366 (indicating the challenger must rebut the presumption by a preponderance of the evidence). "In addition, because this inquiry turns on the understanding of a person of ordinary skill in the art, [courts] often look to extrinsic evidence when determining whether a disputed limitation would have connoted structure to a person of ordinary skill." Id. at 1366.

Here, the Court finds that Tree Defender's construction of "mesh" is not in means-plus-function format. First, because the term "means" does not appear in the construction of "mesh," there is a presumption against means-plus-function format. Second, a person of ordinary skill in the art (i.e., a citrus farmer using IPCs) would understand that "mesh" connotes a sufficiently definite structure. Indeed, Hurst Citrus itself argues that "mesh" has an ordinary meaning of "net-like material," and cites to dictionary definitions which indicate that "mesh" is commonly understood to be a "material like a net." (Doc. # 47 at 6-7). Accordingly, Hurst

23

Citrus's argument fails because Tree Defender's construction is not in means-plus-function format. See also Hill-Rom Services, Inc. v. Stryker Corp., 755 F.3d 1367, 1374-75 (Fed. Cir. 2014) ("[D]efining a particular claim term by its function is not improper and is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of [§ 112]." (citation and quotation marks omitted)).

Finally, Hurst Citrus essentially argues that Tree Defender's proposed construction is a thinly veiled attempt to avoid invalidation of the '092 and '965 Patents by certain prior art references, namely "Morgan (U.S. Pat. No. 6,088,953) and Japanese Utility Model JP 3131895U." (Doc. # 47 at 15-18). According to Hurst Citrus, these prior art references both disclose protective mesh covers for plants, but do not claim an insect-blocking feature. (Id.). Thus, Hurst Citrus argues, Tree Defender is attempting to limit the scope of the '092 and '965 Patents to "sidestep" the prior art references and to preserve validity ex post facto. (Id.). Tree Defender does not address this argument in reply.

Indeed, the matter before the Court is the inverse of a typical claims construction. Typically, a patentee might attempt to broaden the scope of its patent claims to preclude

24

later inventions. Here, however, Tree Defender seeks a narrower scope of the claim term "mesh." Hurst Citrus argues that Tree Defender only seeks this result to avoid invalidity by earlier inventions. The Court finds that the Federal Circuit's guidance is instructive:

> This court has frequently alluded to the "familiar axiom that claims should be so construed, if possible, as to sustain their validity." Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999) (internal quotation marks omitted). At the same time, however, the court has "admonished against judicial rewriting of claims to preserve validity." Id. Accordingly, unless the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous, the axiom regarding the construction to preserve the validity of the claim does not apply.

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 911 (Fed. Cir. 2004). In other words, where the meaning of a claim term is clear after applying the tools of claim construction, the Court should use that definition of the term and should avoid using another definition, even for the purpose of preserving validity.

After applying the tools of claim construction, the Court has concluded that the claim term "mesh" is clearly and unequivocally defined by the narrowed definition provided in the prosecution history of the '111 Application. Under the doctrine of prosecution disclaimer, that narrowed definition

25

attaches to the '092 and '965 Patents. Thus, by constructing the term "mesh" in accordance with the prosecution history, the Court is not "rewriting the claims to preserve validity," but rather applying the meaning of the claim term that was already in place. Hurst Citrus fails to identify any legal authority that would require the Court to disregard an unequivocal disavowal in the prosecution history. Thus, Hurst Citrus's argument fails.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

The claim language in dispute in this case shall be construed as set forth in this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 11th day of February, 2026.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

26